CARAWAY, J.
|! This case is before us on remand from the Louisiana Supreme Court for our consideration of the issues of causation and damages not addressed in our earlier appeal. Finding no manifest error in the trial court’s ruling, we affirm.

Facts

The facts and underlying history of the case have been summarized both in our earlier opinion[1] and in the opinion of the Louisiana Supreme Court and will not be repeated here. See, Swayze v. State Farm Mut. Auto. Ins. Co., 14-1899 (La.6/30/15), 172 So.3d 1026. The issues before us concern whether the trial court erred in awarding Swayze damages in the amount of $22,700.04, representing *84 $7,700.04 for medical expenses and $15,000 general damages.
In its appellate brief, Shelter Mutual Insurance Company (“Shelter”) argues that there was no factual evidence in the record to support a finding that any of Swayze’s medical treatment after July 30, 2010, was related to the April 21, 2010 accident. Rather, Shelter contends that Swayze’s treatment and difficulties were related to a hereditary problem of exosto-sis, the formation of benign bony structures in long bones and joints of the body that causes pain. Thus, Shelter submits that Swayze proved only that she suffered from a “less than three-and-a-half months” soft tissue injury and ^should be limited to amounts already recovered by the settlement and prior medical payments.[2]
On the contrary, Swayze argues that the award was warranted considering that the accident had caused her to suffer through three years of chronic, disabling pain, with a poor prognosis for full recovery.

Discussion

The plaintiff has the burden of proving by a preponderance of the evidence a causal connection between the accident and injuries. Ward v. Davidson, 48,435 (La.App.2d Cir.9/25/13), 125 So.3d 1236; Kaffenberger v. Jones, 34,449 (La.App.2d Cir.2/28/01), 781 So.2d 692. The plaintiff satisfies this burden by proving through medical and lay testimony that it was more probable than not that the injury was caused by the accident. Ward, supra; Kaffenberger, supra; O’Riley v. City of Shreveport, 30,107 (La.App.2d Cir.1/23/98), 706 So.2d 213, writ denied, 98-0752 (La.5/1/98), 718 So.2d 418. A defendant takes his victim as he finds him and is responsible for all natural and probable consequences of his tortious conduct. Id. When the defendant’s negligent action aggravates a preexisting condition, he must compensate the victim for the full extent of the aggravation. Ward, supra; Kaffenberger, supra; Fowler v. Wal-Mart Stores, Inc., 30,843 (La.App.2d Cir.8/19/98), 716 So.2d 511.
Likewise, a plaintiffs recovery of medical charges must be confined to those expenses related to the accident. Kaffenberger, supra; Harper v. Garcia, 32,142 (La.App.2d Cir.8/18/99), 739 So.2d 996; Beasley v. Yokem Toyota, 33,805 (La.App.2d Cir.8/23/00), 767 So.2d 149.
A trial court’s factual findings are accorded great weight and may not be disturbed by a reviewing court in the absence of manifest error. Rosell v. ESCO, 549 So.2d 840 (La.1989).
One injured through the fault of another is entitled to full indemnification for damages caused thereby. Wainwright v. Fontenot, 00-0492 (La.10/17/00), 774 So.2d 70; Smith v. Escalon, 48,129 (La.App.2d Cir.6/26/13), 117 So.3d 576; Caskey v. Merrick Const. Co., Inc., 46,886 (La.App.2d Cir.3/14/12), 86 So.3d 186, writ denied, 12-0847 (La.6/1/12), 90 So.3d 442. General damages are those which may not be fixed with pecuniaiy exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle which cannot be definitely measured in monetary terms. Duncan v. Kansas City S. Ry. Co., 00-0066 (La.10/30/00), 773 So.2d 670, cert. dism., 532 U.S. 992, 121 S.Ct. 1651, 149 L.Ed.2d 508 (2001); Smith, supra; Caskey, supra.
Pain and suffering, both physical and mental, refers to the pain, discomfort, *85 inconvenience, anguish, and emotional trauma that accompany an injury. McGee v. A C & S Inc., 05-1036 (La.7/10/06), 933 So.2d 770; Smith, supra; Caskey, supra. The elements of physical pain and suffering and associated mental anguish are conceptually related and, to a large extent, overlapping; therefore, they are difficult to precisely distinguish. Smith, supra; Caskey, supra.
|4Also included in general damages can be an award for loss of enjoyment or quality of life. Miller v. Lammico, 07-1352 (La.1/16/08), 973 So.2d 693; Smith, supra; Caskey, supra. These damages refer to the detrimental alterations of a person’s ability to participate in the activities or pleasures of life that were formerly enjoyed. McGee, supra; Smith, supra; Caskey, supra.
The trial court has vast discretion in awarding general damages and its determination should rarely be disturbed. La. C.C. art. 2324.1; Youn v. Maritime Overseas Corp., 623 So.2d 1257 (La.1993), cert. denied, 510 U.S. 1114, 114 S.Ct. 1059, 127 L.Ed.2d 379 (1994); Martin ex rel. Lee v. Walker, 47,483 (La.App.2d Cir.10/10/12), 107 So.3d 102. On appellate review, the initial inquiry is whether the trier of fact abused its vast discretion in assessing damages. If it is determined that the trial court abused its discretion, then the appellate court may review prior awards to determine the highest or lowest point which is reasonably within the trial court’s discretion. Smith, supra; Martin, supra; Moody v. AIG Ins. Companies, 43,946 (La.App.2d Cir.1/14/09), 999 So.2d 1207. The appellate court should increase or reduce an award only when the award is beyond that which a reasonable trier of fact could assess for the particular injury, to the particular plaintiff, under the particular circumstances of the case. Youn, supra; Smith, supra; Moody, supra.
At the trial of this matter, Swayze testified and submitted her medical records into evidence. She stated that at the time of the accident, she was 46 years old without any physical limitations. She suffered from an inherited Lgenetic bone disease, multiple hereditary exostoses, that affected joints and long bones. Swayze testified that before the accident, she took anti-inflammatory medication for the exostoses, “probably three or four days in a row maybe once every month or two,” and réceived hip injections once a year to alleviate pain and discomfort. Her condition affected “every joint” except her “neck, my skull, and my spine.” Before the accident she did not have any neck, mid-back or low back problems.
Swayze testified that after the accident, as the day went on, she became sore through her right neck, shoulder, hip and back. She recalled that her mid-back was “the main part that hurt.” Swayze attempted self-help treatments for a few days after the accident but the pain got worse.
She saw Dr, Edward Coleman, her treating physician, with a pain level of seven or eight out of ten, depending on her activity level. When her condition did not resolve, Dr. Coleman referred Swayze to physical therapy which she attended for 23 visits. Ultimately, Swayze testified that physical therapy reduced her pain when she did the therapy every day and that at the time of trial, “the main complaint left was my back.”
Swayze saw Dr, Coleman again in January 2011, with continued complaints of middle back pain she described as hurting “extremely bad.” By March, Coleman recommended home exercises and prescribed a second round of physical therapy. At physical therapy, Swayze testified that she began rib rotation exercises. ■ This proce *86 dure gave temporary relief, but when Swayze returned to her activities, the pain would return. Swayze 1 (¡attended an additional 32 physical therapy sessions through September 2011,
Dr. 'Anil Nanda ultimately advised Swayze that he was unable to say if her continued back pain was nerve related.
Swayze testified that she continues with right side mid-back pain and has been unable to resume all of her activities performed before the accident. Her husband helps to vacuum and “does a lot of the heavier stuff now.” Swayze testified that her activities outside of the home have also been affected. She manages real estate and now hires “more people” to do the work she previously enjoyed. She does not work in the yard “very much.”
Swayze testified that for her daily mid-back pain, she uses a heating pad daily for about 30 minutes which reduces the pain. Swayze also does stretching exercises that give her immediate relief until she gets up. Her pain has affected her 'sleep as well as her relationship with her husband “to some degree.” Swayze also, handles her pain by. limiting or regulating her level of activity. She works in “spurts.”' She testified that her total medical expenses were $12,700.04.
Upon the court’s Questioning of her, Swayze testified that she has had right side back and upper rib pain, since the April 21, 2010 accident; her exostoses had never given her any problems until After the accident. Swayze reiterated that 'the pain is constant, like “somebody has got the heel,of.their shoe shoving it into my back and it’s very uncomfortable.”
17Pr. Coleman testified that he had been treating Swayze for 10-12 years as her primary healthcare provider. He saw her with regard to the accident of April 21; 2010. Dr. Coleman identified his medical records and recalled that before the accident, Swayze did not have musculoskeletal complaints. He confirmed her diagnosis of multiple exostoses, a- condition involving the overgrowth of bones on certain portions of her body and that he had prescribed anti-inflammatory drugs and muscle relaxants. For her condition before the accident, Dr. Coleman testified that Swayze responded to conservative treatment.
Dr. Coleman recalled that Swayze came into his office on May 6, 2010, complaining of neck pain, pain radiating into her right shoulder and right lower back pain, with some radiating into her mid-spine down into her right hip. He diagnosed her with cervical muscle strain, lumbosacral spine strain and ordered X-rays of her neck and low back. He recommended moist heat, anti-inflammatory medication and a followup if she did not improve.
Swayze returned on May 26, 2010, with complaints of right side numbness radiating into her right arm. Swayze reported that her arm had been going numb since the accident, but she did not mention it because she thought it would resolve on its own. Because Swayze’s issues were not resolving, Dr. Coleman recommended physical therapy for her.
After physical therapy, Swayze next saw Dr. Coleman in January 2011, with continued complaints of mid-back pain at a seven-out of ten level. He noted that she had been experiencing lower thoracic back pain |swith radiation into the right lateral chest wall since the April 2010 accident. Dr. Coleman ordered thoracic spine X-rays and MRIs of the brain and thoracic spine. The thoracic MRI did not indicate any'disk bulge or herniation in the location, of Swayze’s pain.
By March 10, 2011, Dr, Coleman concluded that Swayze had right thoracic side back pain; condition unchanged. He rec *87 ommended that Swayze continue to take her medication and undergo further physical therapy for her thoracic spine, specifically for her rib. pain.
Regarding his attempt to find out what was causing Swayze’s pain, Dr. Coleman testified:
Of course, she had the bony exostoses, uh, that probably was causing some of her pain. She has a scoliosis, which is a slight curvature of the spine. Um, the radiologist commented on the peripheral margins of the T7 through 9 disk spaces, that, um, there may be some compromise of the T8 neural foramen. This neural foramen is an opening that nerves exit from the spinal cord through. So, the radiologist commenting there' ... is some compromise of that opening that the nerve occupies.
Dr. Coleman testified that pressure on a nerve can produce pain and discomfort.
Dr. Coleman eventually consulted Dr. Nanda about Swayze, who continued to have pain after her second round of physical therapy. Dr. Coleman identified two letters from Dr. Nanda, one including a final conclusion regarding Swayze’s condition.[3] Dr. Nanda reviewed Swayze’s |9MRI of the thoracic spine according to Dr. Coleman. Dr. Nanda also ordered a CT scan of Swayze’s thoracic spine.
Regarding causation, Dr. Coleman testified that the exostosis is a chronic condition which Swayze had for'years.' He testified that “people are 'relatively '’not symptomatic with ’this condition that’s chronic,” “but they have an injury of some kind and it seems to cause the chemical changes that we suspect that’s associated with an acute injury which ... caused inflammation” and “there can be some displacement and movement of tissue that causes a person to become very symptomatic then.”. Dr. Coleman further explained that prior to the accident, “they seem to be doing okay,” and after an event or accident, “they have a lot of pain and numbness and tingling and symptoms.”
Dr. Coleman concluded that “[Swayze] had acute symptoms associated with an injury that’s caused a process to start that’s more acute and new in addition to the chronic condition.” He testified that Swayze’s prospects of returning to her pre-accident state would be “unfavorable.”
On- cross-examination, Dr. Coleman agreed that exostoses can cause pain even in the absence of acute trauma such as a car accident. He confirmed that Swayze’s discharge summary from Her first round of physical therapy indicated that she had been discharged due to her goals being achieved, and that she indicated that she was without pain upon her release (D-4).
11flShelter presented no testimony, instead relying on documentation relating to Swayze’s medical treatment, that it introduced into evidence.
Our review of the medical evidence and testimony discloses no manifest error in the trial court’s determination that *88 the April 21, 2010 automobile accident caused Swayze’s three-year back problems and the corresponding damage award of $15,000 general damages and $7,700.04 for medical expenses. Moreover, even when the $15,000 general damage award is considered with the prior $25,000 award for the same injury, there is no abuse of discretion in the overall award for this injury.
Swayze’s testimony established that the onset of her back pain began with the accident in April 2010 and had not subsided as of the time of trial. Although she temporarily responded to physical therapy and home exercises, the evidence indicates that Swayze has had no permanent resolution of her right thoracic back and rib complaints since the accident. She testified that before the accident she did not have lower back pain even with her exos-toses. She consistently saw Dr. Coleman for right lower back pain after the accident. Most importantly, Dr. Coleman related the back pain to an aggravation of Swayze’s preexisting exostoses caused by the accident. His statement that part of Swayze’s pain was caused by the exostoses was not inconsistent with this conclusion. No independent medical evidence refuted his position. Thus, the trial judge was free to accept the physician’s conclusion that the accident aggravated and made symptomatic Swayze’s preexisting disease. Likewise, from the evidence, the judge could have reasonably accepted that the duration of the injury h spanned three years, rather than three months, and had not truly resolved by the end of her 2010 physical therapy. For this three-year chronic injury, the general damage and medical payment awards are supported by the record.[4]
For the foregoing reasons, the judgment of the trial court is affirmed. Costs of this appeal are assessed to Shelter.
AFFIRMED.

. Swayze v. State Farm Mut. Auto. Ins. Co., 49,079 (La.App.2d Cir.6/4/14), 142 So.3d 369.

. As explained in the earlier opinions, Swayze settled with State Farm for its policy limit amount of $25,000 and Shelter paid her $5,000 for medical payments coverage.

. Dr. Nanda’s letter’to Dr. Coleman, dated February 21, 2012, and introduced into evidence, indicated that his "review of the films show a benign bony exostosis from right lateral margin of T8 consistent with mature old osteochondroma. There is mild involvement of peripheral margin of T7-9 disc spaces with no significant herniation or stenosis in any of the remaining levels" (D — 17). The CT scan of the thoracic spine results were also admitted into evidence and indicated "exostosis along right body and pedicle of 8th thoracic vertebra is again demonstrated with marked compression of right T8 neural foramen and mild associated deformity of the right 8th rib at costovertebral joint due to displacement. No associated enhancing lesion is found, There is mild scoliosis of the thoracic spine convex to the right with apex- of the scoliosis at the 8th thoracic vertebra" (D-19).

. Notably, Shelter argues only that the damage award is abusively high for a “three-and-a-half month" injury.